# EXHIBIT A

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

LARRY NORMAN HAYNES AND )
DENISE HAYNES, )
       Plaintiffs, )
)
vs. )   Civil Action No. CV-06-_1468_
)
MARIA SARSFIELD, an )
individual; Fictitious )
Defendant A thereby intending )
to refer to the individual )
who is the owner and/or )
operator of the vehicle )
that collided with the )
Plaintiff on the occasion )
described in the Complaint )
and made the basis of this )
lawsuit whose negligence )
and/or wanton conduct )
caused Plaintiff's damages; )
Fictitious Defendants B, C, )
and D, thereby intending to )
refer to the legal entity, )
person, firm or corporation )
for whose benefit Defendant, )
MARIA SARSFIELD, was )
acting on the occasion made )
the basis of this lawsuit )
whose negligence and/or )
wanton conduct caused )
Plaintiff's damages; )
Fictitious Defendants E, F, )
and G, thereby intending )
to refer to the legal )
entity, person, firm or )
corporation responsible for )
the state of repair of )
the vehicle occupied by the )
Defendant, MARIA SARSFIELD )
on the occasion described in )
the Complaint made the basis )
of this lawsuit whose )
negligence and/or wanton )
conduct caused the )
Plaintiff's damages; )
Fictitious Defendants H, I, )



EXHIBIT A

and J, thereby intending to            )
refer to the legal entity,             )
person, firm or corporation            )
who negligently and/or                 )
wantonly entrusted the                 )
defendant driver with                  )
possession of their vehicle            )
on the occasion described in           )
the Complaint; fictitious              )
Defendants K, L and M,                 )
thereby intending to refer             )
to the legal entity, person,           )
firm or corporation who                )
negligently and/or wantonly            )
caused, contributed to cause           )
and/or allowed the accident            )
to occur on or about                   )
September 8, 2004, causing             )
the Plaintiff's damages set            )
forth herein; all of which             )
are unknown to the Plaintiff,          )
but will be added by                   )
amendment when ascertained,            )
                                       )
        Defendants.                    )

---

## COMPLAINT

---

COMES NOW the Plaintiff and for his Complaint against the Defendant states as follows:

1. Plaintiff, **Larry Norman Haynes**, is over the age of nineteen (19) years and is a resident of the city of Attalla in Etowah County, Alabama.

2. Plaintiff, **Denise Haynes**, is over the age of nineteen (19) years and is a resident of the city of Attalla in Etowah County, Alabama.

3. Defendant, **Maria Sarsfield**, is over the age of

nineteen (19) years and a resident of the city of Temple Terrace in Hillsborough County, Florida.

4. Fictitious Defendants, A, B, C, D, E, F, G, H, I, J, K, L, and M are those individuals, entities, corporations, or partnerships who are unknown at this time, but will be added by amendment when ascertained.[1]

5. Plaintiffs aver that on or about September 8, 2004, Plaintiff, Larry Norman Haynes, was lawfully operating his vehicle traveling on northbound on U.S. Highway 231, at the intersection of Trotman Road and U.S. 82 when the Defendant entered the path of the Plaintiff on the northbound lane of U.S. Highway 231 in Montgomery County, Alabama, when at said time and place the vehicle owned and driven by Defendant crashed into, upon, and against the vehicle driven by the Plaintiff.

6. As a proximate consequence of the aforesaid negligence and/or wantonness on the part of Defendant, Plaintiff, Larry Norman Haynes, was injured and damaged including, but not limited to, the following:

    A. Plaintiff suffered permanent injuries, including injuries to his back; he was bruised and contused and make sick and sore;

---

[1] Hereafter, any referral to Defendants will be to all Defendants, named and fictitious.

B. Plaintiff was caused to seek medical attention in and about his efforts to heal and cure his injuries and will be caused to seek additional medical attention in the future;

C. Plaintiff was caused to incur medical bills, hospital bills, and prescription expenses in and about his efforts to heal and cure his injuries and he will be caused to incur additional bills in the future;

D. Plaintiff was caused to suffer physical pain and discomfort;

E. Plaintiff was caused to suffer mental anguish, distress and embarrassment;

F. Plaintiff has been caused to lose the ability to perform those activities of a man his same age and will continue to do so in the future.

7. Plaintiffs aver that the Plaintiff, Denise Haynes, is the wife of Plaintiff, Larry Norman Haynes, and because of the injuries and damages to her husband, she has lost the care, comfort and society of said husband.

8. Plaintiffs further aver that the aforesaid injuries and damages were proximately caused by the following culpable acts of the Defendant in that Defendant was negligent and wanton in the operation of a motor vehicle on the

occasion of the incident made the basis of this suit.

## COUNT ONE
### (NEGLIGENCE/WANTONNESS)

9. Plaintiffs adopt and re-allege all paragraphs contained in this Complaint as if set forth fully herein.

10. The Defendant was under a duty to drive her vehicle in a safe manner and to follow the rules of the road. The Defendant breached that duty when she failed to operate said vehicle safely and allowed her vehicle to collide with a vehicle driven by the Plaintiff, Larry Norman Haynes.

11. As a direct and proximate result of said negligence, the Plaintiff, Larry Norman Haynes, has suffered extensive damages, including, but not limited to, property damage, lost wages, medical bills, pain and suffering, and permanent injuries.

12. The Defendant has acted recklessly and in complete disregard for the health, safety, and welfare of the Plaintiff, Larry Norman Haynes.

13. As a direct and proximate result of said wantonness and recklessness, the Plaintiffs have suffered extensive damages, including, but not limited to, property, lost wages, medical bills, pain and suffering, and permanent injuries.

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs demand

compensatory and punitive damages against the Defendant in an amount to be determined by the trier-of-fact, including interest, costs, attorney fees, and any such other and further relief this Court deems appropriate.

## COUNT TWO
### (LOSS OF CONSORTIUM)

14. Plaintiffs adopt and re-allege all paragraphs contained in this Complaint as if set forth fully herein.

15. Plaintiff, Denise Haynes, is the wife of Plaintiff, Larry Norman Haynes, and because of the injuries and damages to her husband, she has lost the care, comfort and society of said husband.

16. As a direct and proximate result of the negligence and wantonness of the Defendant, Plaintiff, Denise Haynes, has suffered damages.

17. The Defendant has acted recklessly and in complete disregard for the health, safety, and welfare of the Plaintiff, Denise Haynes.

18. As a direct and proximate result of said wantonness and recklessness, the Plaintiffs have suffered extensive damages.

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs demand compensatory and punitive damages against the Defendant in an amount to be determined by the trier-of-fact, including interest, costs, attorney fees, and any such other and further relief this

Court deems appropriate.

_/s/ R. Gordon Pate_
R. GORDON PATE,
Attorney for the Plaintiff

_/s/ W. Seals_
W. WHITNEY SEALS,
Attorney for the Plaintiff

OF COUNSEL:

PATE & COCHRUM, LLP
P. O. Box 10448
Birmingham, AL 35202-0448
(205) 323-3900
(205) 323-3906

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY IN THIS CAUSE.

_/s/ W. Seals_
OF COUNSEL

PLEASE SERVE DEFENDANT, VIA CERTIFIED MAIL, TO THE FOLLOWING ADDRESSES:

Ms. Maria Sarsfield
6126 East 110th Avenue
Tampa, FL 33617-3128

Ms. Maria Sarsfield
6126 110th Avenue
Temple Terrance, FL 33617

# EXHIBIT B

Page 25

1   A. To my knowledge, yes.
2   Q. From what you're describing to me, this
3      lawsuit was listed as a claim on your
4      bankruptcy petition or your bankruptcy
5      pleadings that were filed with the court?
6   A. My understanding that's what's happening, yes.
7   Q. You were asked about it by the bankruptcy
8      trustee?
9   A. Yes, I was.
10  Q. I forgot to ask you. As far as on prior
11     accidents in the last 20 years, have you been
12     in any automobile accidents where you were a
13     passenger?
14  A. No.
15  Q. And other than the automobile accident that
16     we're talking about today involving
17     Ms. Sarsfield, have you been involved in any
18     prior automobile accidents in which you
19     suffered a physical injury which required
20     medical attention?
21  A. No.
22  Q. Have you ever filed a claim for worker's
23     compensation benefits?

Page 26

1   A. No.
2   Q. Let me ask you some questions about the
3      accident. Do we agree that it happened on
4      September 8, 2004?
5   A. Yes.
6   Q. And according to the accident report, it was a
7      Wednesday. Does that sound right to you?
8   A. That sounds correct.
9   Q. The accident report lists the time of 9:25.
10     Does that sound about right to you?
11  A. Yes.
12  Q. Had you worked that day?
13  A. Yes.
14  Q. And had you worked down in Ariton?
15  A. Yes.
16  Q. Did you work a full day?
17  A. Yes.
18  Q. Anything unusual about that day that you
19     remember prior to the accident?
20  A. No.
21  Q. What were your normal work hours?
22  A. From eight till normally 5 or 6 p.m.
23  Q. And do you recall approximately when you got

Page 27

1      off work the day of the accident?
2   A. It was about 6 p.m.
3   Q. What did you do after you got off work?
4   A. Well...
5   Q. Did you make any stops, get anything to eat or
6      drink or anything like that?
7   A. No.
8   Q. How long did you stay at the house?
9   A. Probably till around 8 p.m.
10  Q. What did you do after that?
11  A. Got in my car and was heading north.
12  Q. Where were you going?
13  A. I was going to Prattville.
14  Q. Why were you going to Prattville?
15  A. My fiance, wife now, at the time, we wanted to
16     see each other and decided we would split the
17     difference and meet each other halfway between
18     her house and my house, which is approximately
19     Prattville.
20  Q. And you were driving, looks like, a 1996 Ford
21     Contour?
22  A. Correct.
23  Q. How long had you owned that vehicle?

Page 28

1   A. Since 2001.
2   Q. To your knowledge at the time of the accident,
3      did it have any type of mechanical problem?
4   A. No, did not.
5   Q. To your knowledge did all the exterior lights
6      on the vehicle work?
7   A. They did.
8   Q. It looks like you had made it almost to
9      Montgomery at the time of the accident,
10     correct?
11  A. Correct.
12  Q. What were the weather conditions like that
13     night?
14  A. The skies were clear. It was humid but clear,
15     dry.
16  Q. Was the pavement dry?
17  A. Pavement was dry.
18  Q. Did you have any rain or bad weather on the
19     way up from Ozark to Montgomery?
20  A. No.
21  Q. How would you describe the traffic in the 3 or
22     4 miles prior to the accident?
23  A. I would say it was light.

Page 29

1  Q. And you were in the car by yourself, correct?
2  A. Correct.
3  Q. Did you have a cell phone with you?
4  A. Yes.
5  Q. Who was your cell phone service with?
6  A. Cingular.
7  Q. Do you still have service with them?
8  A. Yes.
9  Q. And do you still have the same phone number?
10 A. No.
11 Q. Do you recall what your phone number was at
12    the time of the accident?
13 A. I do not.
14 Q. Was it a 334 Area Code number?
15 A. I'm trying to remember. I don't think so. I
16    think it was 256.
17 Q. And did you have a portable cell phone?
18 A. A portable cell phone?
19 Q. Well, I guess they are all pretty much
20    portable now, but a hand-held one that you
21    could take with you.
22 A. Yes.
23 Q. Did you have it in the car with you?

Page 30

1  A. Yes.
2  Q. Were you familiar with that stretch of roadway
3     on U.S. 231 where the accident happened?
4  A. Yes.
5  Q. And when you would go see your fiance, is that
6     typically the way you would drive?
7  A. Yes.
8  Q. Whether you were meeting in Prattville or
9     going up to Attalla?
10 A. Yes.
11 Q. And were you generally familiar with the area
12    where the accident happened where that gas
13    station, the truck stop, is?
14 A. Yes.
15 Q. As you were approaching that truck stop -- I
16    guess the Shell station -- do you recall which
17    lane you were in?
18 A. I do.
19 Q. Tell me which lane you were in.
20 A. I was in the right lane.
21 Q. That's the outside lane?
22 A. Well, I mean, it was in the rightmost lane.
23 Q. But you weren't up against the center median.

Page 31

1     You were up against the outside?
2  A. Yeah. I was away from the median.
3  Q. And did that car have cruise control?
4  A. Yes.
5  Q. And were you using it at the time of the
6     accident?
7  A. Yes, I was.
8  Q. What did you have it set at?
9  A. I had it set at 65.
10 Q. Do you recall what the posted speed limit out
11    there is?
12 A. Sixty-five.
13 Q. On the accident report, the trooper has an
14    estimated speed listed of 67. That's just
15    sort of an odd number. Do you know where he
16    would have gotten the 67?
17 A. Yes. My car at that time -- I had it checked,
18    et cetera -- 67 equated to 65 miles an hour
19    exactly. And I knew that because they set up
20    the mobile radar stations that check your
21    speed, several of those, down in Ozark through
22    that area. And every time I had it set for
23    65, I was always slow. I was always at 63.

Page 32

1  Q. So if you wanted to drive 65, you would set it
2     at 67?
3  A. Correct.
4  Q. And was there some discussion about that
5     possibly where the trooper got that number to
6     stick on the accident report, if you know?
7  A. I mean, was there discussion with the trooper
8     about that?
9  Q. Well, he has written down 67. It just seemed
10    like a funny number to me. Do you remember
11    having some discussion like we just had about
12    your car, setting it at 67 to go 65?
13 A. There was no discussion other than he asked
14    me -- When he asked me what happened, I said I
15    had my cruise control set for 67, which is
16    equal to 65 miles an hour. That's what I told
17    him.
18 Q. And you were in the right lane?
19 A. Correct.
20 Q. Were there any cars anywhere, say, within a
21    few hundred yards of you as you approached the
22    Shell truck stop?
23 A. Not in the northbound lanes.

Page 33

1  Q. And were there any cars traveling in the same
2     direction as you in front of you that you
3     could see immediately prior to the wreck?
4  A. There was. There was somebody in the right
5     lane, probably if I had to estimate, half a
6     mile.
7  Q. Were there any vehicles traveling in the same
8     direction as you that were behind you?
9  A. Not that I saw.
10 Q. None that were visible?
11 A. Huh-uh (negative response).
12 Q. Any vehicles in the inside or left lane
13    anywhere near you at the time of the wreck?
14 A. No.
15 Q. Other than you and Ms. Sarsfield, do you
16    contend that there were any other vehicles
17    that had any role whatsoever in this accident?
18 A. No.
19 Q. In other words -- That's kind of a funny
20    question, but did anybody go by Ms. Sarsfield
21    and have a near miss? Did somebody come up
22    behind you that really had to jam on their
23    brakes to avoid a collision or anything like

Page 34

1     that involving other vehicles other than you
2     and Ms. Sarsfield?
3  A. No.
4  Q. Tell me how the accident happened.
5  A. Well, I was in the right lane driving north,
6     and I remember the truck stop there because it
7     was generally usually busy. I remember seeing
8     lots of trucks or parked trucks, some at the
9     pumps, some in the lot. I remember seeing a
10    pair of headlights on the first -- as I'm
11    heading north, the first driveway in there.
12    Headlights right there, which I didn't think
13    much about. There are normally lots of
14    headlights there.
15        And as I came closer to that gas
16    station -- I would say about 50 feet -- I saw
17    this truck start pulling out. I immediately
18    hit the brakes, started swerving to the left.
19    The truck continued to come out. At that time
20    I was standing on my brakes, and I could feel
21    the car resisting turning left any sharper.
22    If I was going to miss her -- I couldn't go
23    right anymore, and I remember hearing the

Page 35

1     sound of gravel. Then I hit the grass and
2     then smack. Glass was everywhere. And I came
3     to rest in the median in the grass probably a
4     hundred feet.
5  Q. As I'm asking you these questions, I know it's
6     difficult to give me specific speeds,
7     distances and times, but I want you to give me
8     your best estimates. Okay?
9         The headlights that you saw at the first
10    driveway that you were describing for me, were
11    those Ms. Sarsfield's headlights?
12 A. Yes.
13 Q. Were they facing you? Were they sideways?
14    Tell me what you could see of those
15    headlights.
16 A. What I could see was that the cab of the
17    truck, because it was silhouetted because of
18    the pump lights -- I saw the edge of the
19    headlights, and they were pointing straight
20    across perpendicular to the roadway.
21 Q. And did you see her truck at a stop before she
22    began pulling out or was she always moving?
23 A. She was at a dead stop because I remember as I

Page 36

1     was driving, I saw the lights. There was no
2     motion from anybody. I saw a lot of parked
3     trucks.
4  Q. Were there any other lights visible along the
5     side of her tractor or trailer?
6  A. I'm sure there were, but, then again, because
7     of that vantage point there were a lot of
8     trucks parked in back this way so you could
9     see the marker lights. The rest of the
10    trailer portion of it would -- it blended into
11    everything else that was there. What I recall
12    seeing was the cab right there on the side of
13    the road and the headlights pointing straight
14    across the road.
15 Q. When you first saw her, was she at a stop?
16 A. She was at a stop.
17 Q. And you gave an estimate of about 50 feet --
18    that you were about 50 feet away from her when
19    she started pulling out?
20 A. Yes.
21 Q. Is that your best judgment?
22 A. Best judgment, yes.
23 Q. And up until the time you hit your brakes, was

# EXHIBIT C

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 17

1  Q. The present?
2  A. The present.
3  Q. Okay. So at the time of this collision that we're
4  here about, you were self-employed?
5  A. Yes, sir.
6  Q. All right. Do you -- what is the name of your
7  company, or do you have a company?
8  A. LTV, just the letters LTV.
9  Q. What do those initials stand for?
10  A. Lulu's Trucking Company.
11  Q. Okay. Is Lulu's Trucking Company incorporated?
12  A. No, sir.
13  Q. All right. Are you the sole proprietor?
14  A. That's me. As far as I know, that's what you call
15  it.
16  Q. Do you have any employees?
17  A. Nope.
18  Q. Okay. How do you get runs now that you're working
19  on your own and have been since '94?
20  A. Word of mouth.
21  Q. Do you have any specific clients that you generally
22  work with?
23  A. I have a couple of people that I use different times
24  of the year, depending on where the produce is, because
25  that's what I haul, produce.

Page 18

1  Q. All right. At the time of the collision we're here
2  about today -- and I believe it's my understanding that
3  occurred on September the 8th, 2004. Does that sound correct
4  to you?
5  A. Um-hmm. That's correct.
6  Q. On that date, who were you hauling for?
7  A. Hauling for Paulk Vineyards.
8  Q. I'm sorry?
9  A. Paulk Vineyards.
10  Q. Where are they based out of?
11     MR. HIGGINS: How do you spell that?
12     THE WITNESS: Oh, P-a-u-l-k.
13     MR. HIGGINS: Okay.
14  BY MR. SEALS:
15  Q. Where is Paulk Vineyards based out of?
16  A. Wray, Georgia.
17  Q. Had you hauled for them before this incident?
18  A. Yes, sir.
19  Q. Out of curiosity, what exactly were you hauling at
20  the time?
21  A. Grapes, muscadine grapes.
22  Q. The vehicle that you were driving at the time, based
23  on my understanding it was a 1998 Peterbilt, Model 379. Does
24  that sound correct to you?
25  A. That's correct.

Page 19

1  Q. When did you purchase this vehicle?
2  A. November of '97.
3  Q. Did you purchase it new?
4  A. Brand-new. Ordered it.
5  Q. About how many miles did it have on it at the time
6  of the accident?
7  A. I don't remember.
8  Q. Okay. Now, had anyone other than you taken this
9  truck on any runs or anything like that in the time that
10  you'd owned it?
11  A. When the truck was purchased, I was married.
12  Q. Okay.
13  A. My ex-husband drove the truck for probably six
14  months. He's the only other person that drove it.
15  Q. Was it safe to say that within, say, a year of this
16  accident you were the only person that had operated that
17  vehicle?
18  A. I was the only one that's operated that vehicle
19  since January, February of '99.
20  Q. We talked about CDL and the old Florida chauffeur's
21  license. When exactly did that transition happen from
22  chauffeur's license to CDL, if you know?
23  A. Sometime when I worked at RPS. I don't remember
24  what year. I would say late '80s.
25  Q. In the late '80s, while you were working with RPS,

Page 20

1  were you required to switch over to get a CDL?
2  A. Everybody.
3  Q. Okay. So you weren't grandfathered in with a
4  chauffeur's license?
5  A. I was grandfathered in, but you still had to go and
6  get your license updated.
7  Q. All right. Has your license ever been suspended for
8  any reason?
9  A. No, sir.
10  Q. You mentioned endorsements earlier. What
11  endorsements do you currently have on your license?
12  A. Doubles, triples, which means I am authorized to
13  pull double, triple trains and hazmat, hazardous materials.
14  Q. How long have you had those endorsements? Well, let
15  me ask you --
16  A. Long time, but I don't --
17  Q. Did you have them at the time of this accident?
18  A. Yes, sir.
19  Q. Okay. And I'm unfamiliar with CDLs. Is that
20  something that you have to update every single year?
21  A. No. It's like a regular driver's license, you know,
22  like yours, five or seven. I don't know how many years, but
23  it's several years.
24  Q. When was the last time prior to this accident that
25  you had to have it renewed?

5 (Pages 17 to 20)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 29

1  A. I have no clue.
2  Q. Okay.
3     MR. HIGGINS: It is.
4  BY MR. SEALS:
5  Q. All right. Where were you coming from before you
6  got to the truck stop?
7  A. Wray, Georgia.
8  Q. And that's where you picked up your load?
9  A. Yes, sir.
10 Q. Okay. About what time did you pick up your load in
11 Wray, Georgia?
12 A. I don't remember right now.
13 Q. Can you tell me as you sit here today how long you
14 had been driving on the road before you stopped at that truck
15 stop?
16 A. I had stopped at that truck stop, and I had taken my
17 break. And I got up, and I ate dinner, and I left. But
18 exactly the time frame, without my books, my logbooks in
19 front of me, I can't tell you the exact time.
20    MR. SEALS: All right. All right. If
21 possible, I'm going to want to see how long she was
22 on there. If I can get just a copy of the page of
23 that logbook if she has it available --
24    MR. HIGGINS: I don't have any objection to
25 producing those, though I don't think they've been

Page 30

1  asked for yet, so do you still have those?
2     THE WITNESS: I'm sure they're in a box
3  somewhere. I'll look for them.
4     MR. HIGGINS: Okay. We'll do that.
5  BY MR. SEALS:
6  Q. No problem. Thank you, ma'am.
7     Let me ask you. Do you recall, had you picked up
8  that load that morning? The day before? Do you recall?
9  A. Right now, I don't recall. I haul so many loads.
10 Q. Okay. How often are you on the road? Seven days a
11 week? Five days a week?
12 A. It can vary great. I can be on the road two days,
13 four days. I can take a trip and be gone two weeks.
14 Q. At this time do you know how many days you had been
15 on the road prior to this accident during the week? And this
16 accident, I believe, happened on a Wednesday.
17 A. I'm trying to -- I'm trying to think of where I was
18 before the accident --
19 Q. Yes, ma'am.
20 A. -- so without my book in front of me, I can't be
21 specific. But I'm thinking I was -- again, I'm thinking --
22 Q. Yes, ma'am.
23 A. -- I was in Tampa and I went from Tampa to load the
24 load to go to Dallas. So how long I was home in Tampa, you
25 know, prior to leaving Tampa, I'd have to look in the book.

Page 31

1  Q. Yes, ma'am.
2     Had you traveled up 231 on this stretch of road in
3  the past?
4  A. Yes, sir.
5  Q. A bunch of times? Once or twice? Do you know?
6  A. Well, it's quite a few times.
7  Q. Is it safe to say that you were familiar with that
8  stretch of road?
9  A. Yes, sir.
10 Q. Had you stopped at that truck stop --
11 A. Yes, sir.
12 Q. -- there on Pike Road before?
13 A. Yes, sir.
14 Q. You had?
15 A. Yes, sir.
16 Q. Okay.
17    MR. HIGGINS: Let him finish his questions.
18 A. I know. I realize that.
19 BY MR. SEALS:
20 Q. You say you stopped and took a break. How long was
21 your break?
22 A. You're required to take a ten-hour break.
23 Q. Had you been at that truck stop for ten hours?
24 A. At least, if not longer.
25 Q. How much time elapsed from the time your break ended

Page 32

1  and the time you got on the road and this incident occurred?
2  A. I can't specify that off the top of my head.
3  Q. All right. Do you know -- did you -- let me ask you
4  this. During those ten hours, what did you do?
5  A. I slept and I ate.
6  Q. Was this -- did this incident occur after you ate,
7  or had you just gotten up and gotten in the truck and this
8  incident happened?
9  A. After I ate.
10 Q. Now, I'm not familiar with Wray, Georgia, or where
11 that's located. But let me ask you this. Had you taken
12 loads from Wray, Georgia, to Dallas in the past?
13 A. Yes, sir.
14 Q. And that being said, I guess where were you headed
15 up 231? Were you headed toward I-20 or --
16 A. Going up 231, and I'm thinking the number is 271,
17 the one that goes north to 85. Are you familiar with that
18 area?
19 Q. Vaguely.
20 A. Well, I couldn't remember if that's the right
21 number, but it wasn't too far past the truck stop. There's a
22 traffic light. And you take that road, which goes up and
23 catches 85. Then you bring 85 back south to 65. You come
24 south on 65 to 80, and run 80 toward York, Alabama.
25 Q. Okay.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

### Page 33

1  A. That's the most direct route without going through
2  the city of Montgomery.
3  Q. Yes, ma'am. Now, I may have misheard you or didn't
4  hear. Were you heading towards Dallas or coming from Dallas?
5  A. Towards Dallas.
6  Q. So the truck was fully loaded at that time?
7  A. I had -- I can't remember whether it was 8 or 10
8  pallets of grapes. It was -- it was a half a load or -- you
9  know, I can hold like 22 pallets, and I can't remember if
10 there was 8 or 10. I think there was 10 pallets of grapes.
11 I'm not --
12 Q. Do you have an estimate about how much 8 pallets of
13 grapes would weigh as a load?
14 A. Oh, not much. They're all trayed up for the store,
15 so they're not like they're lug boxes. Lug boxes would have
16 been heavier. They're all trayed up in one-pound or
17 one-and-a-half-pound plastic shelves. And the weight, I
18 don't -- it's not heavy.
19 Q. All right. At any point did you see my client's
20 vehicle prior to this incident?
21 A. No, sir.
22 Q. Let me ask you about the lighting on that exit. Do
23 you know, are there streetlights or is there any lighting
24 around the exit of that Shell station?
25 A. There's one streetlight that I know of in the

### Page 34

1  parking lot. There's a Shell sign, and there are lights
2  around the fuel island, the awning of the fuel island; and
3  then, of course, the little truck stop itself has some
4  lights, but it's not well-lit.
5  Q. Do you know, are there lights in the median or along
6  the sides of this road?
7  A. No.
8  Q. There are not?
9  A. There are not.
10 Q. Do you remember when I sent over some requests for
11 admissions in this case asking you to admit or deny certain
12 facts or statements?
13 A. I had two kinds of paperwork from the lawyer.
14 Q. Okay.
15 A. I don't know unless I'm looking at what you have
16 there as to what I'm --
17 Q. Okay. Well, this was provided to me by your
18 attorney. And Number 5, I asked, "Admit or deny that you" --
19 I think that's kind of difficultly worded -- "Admit or deny
20 that you did not see the plaintiff's vehicle from the time of
21 accident," and you deny you did not see the plaintiff's
22 vehicle. Is that true or false now that you're telling me
23 you didn't see it before? I'm trying to figure out what's
24 going on.
25 A. The way that's written on there, I don't understand

### Page 35

1  that.
2  Q. Okay.
3  A. My words are I don't see anything coming at all
4  before the accident.
5  Q. No headlights?
6  A. Nothing.
7  Q. No nothing?
8  A. I saw nothing.
9  Q. Is it fair to say that at no time prior to the
10 collision you didn't -- you did not see my client's vehicle?
11 And what I mean by that is before impact, there was no point
12 in time where you saw my client's vehicle or realized you
13 were about to have an accident. Is that a fair statement?
14 A. I did not see the client -- your client's vehicle
15 until the vehicle was up in the median past my truck.
16 Q. All right. Did you feel any sort of collision
17 between your vehicle and my client's vehicle?
18 A. I'm not positive if it was a -- a bump, a thump. I
19 wasn't sure if I didn't feel something more than I heard
20 something. All I saw was a flash.
21 Q. Do you know what caused the flash?
22 A. I do now.
23 Q. What was that?
24 A. My headlights on busted glass.
25 Q. In your own words, if you could, tell me what

### Page 36

1  exactly happened at that moment you saw the flash up until
2  the moment you stopped your vehicle that you recall.
3  A. I was stopped. I froze.
4  Q. So immediately when you saw the flash --
5  A. -- I froze. I didn't know what the flash was.
6  Q. Did you apply your brakes or what happened?
7  A. I'm just trying to figure out how to word this. I
8  had my foot on the brake and on the clutch when I pulled out
9  of the truck stop.
10 Q. All right.
11 A. I let off from the brake and the clutch to ease out
12 onto the highway. I made it across the first lane, and I'm
13 into the second lane. There's still nothing coming. I got
14 one foot holding -- I'm not on the brake pushing it down,
15 because the clutch will hold the truck slow. And I looked
16 back to this pothole, and then I see this flash, and then I
17 just hit the brake completely, just completely -- just
18 completely stopped the truck.
19 Q. Okay. I want to go through that just a little bit.
20 How much time in your estimation did it take for the front of
21 your vehicle to get from, I guess, the stopped position there
22 at the -- the -- the edge of the road to the point where this
23 impact occurred? And what I'm getting at is, is it a
24 relatively slow process getting out into the road? Is it
25 fairly quick?

9 (Pages 33 to 36)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 37

1  A.  It's like a turtle.
2  Q.  It's like a turtle.
3      You mentioned that you turned to look back at a
4  pothole immediately before the collision. Where exactly was
5  the pothole?
6  A.  Right at the edge of the road at the truck stop.
7  Q.  All right. Is it fair to say that immediately prior
8  to this collision you weren't looking at the road in front of
9  you or the road towards where you were going but actually
10 behind you at a pothole?
11 A.  I pulled out. I looked to the left. I looked to
12 the left. When I got to the edge of the road by the grass, I
13 went like this to look to make sure I was missing the
14 pothole. When I turned my head back like this, that's when I
15 saw this flash, and I just froze.
16 Q.  All right. I want to know a little bit about the
17 lay of the land there. Is the road fairly straight at that
18 point? Is there a curve before you get to the gas station?
19 What does it look like?
20     MR. HIGGINS: You talking about the direction
21 Mr. Haynes was traveling from?
22     MR. SEALS: The direction that Mr. Haynes would
23 have been traveling towards Montgomery.
24 A.  231 North.
25 BY MR. SEALS:

Page 38

1  Q.  Yes, ma'am.
2  A.  When you're at the truck stop and you're looking
3  south at 231 North coming at you, I'm not sure if you would
4  call it a bend or a curve or a rise in the road, but you can
5  see things coming from a long way. It's easier at night than
6  it is in the daytime because cars sit so low to the road.
7  But at nighttime you can see headlights coming; that when you
8  pull up to the truck stop, this is the road. It's not like
9  it's just level. It's not like you just pull out and it's
10 level. The parking lot is down a little. So when you're
11 coming up, you're at a little bit of a rise as you're looking
12 like that.
13 Q.  All right. Are you alleging at all that my client
14 didn't have his headlights on immediately prior to this
15 collision?
16 A.  I don't know whether he had his headlights on or
17 not. I didn't see the car at all.
18 Q.  All right. Okay. Immediately after this collision,
19 you said you froze. What happened then?
20 A.  Well, like I said, I just hit the brake, and I
21 stopped, because I didn't know what the flash was in front of
22 me.
23 Q.  How long did it take you to determine that a
24 collision had occurred?
25 A.  Well, I wasn't sure what had happened. I just -- I

Page 39

1  just froze. I saw this car in the grass. And the only way I
2  saw it is because the brake lights were on of the car. I'm
3  like "Did something just happen" to myself. I don't know.
4  So I got out of the -- put the truck in park and all that and
5  got out and went to go check to see.
6  Q.  Did you leave the truck in the roadway?
7  A.  Yeah. I was in the road. I didn't know what had
8  happened.
9  Q.  All right. So you got out of the truck?
10 A.  Got out of the truck. And I stepped out of the
11 truck and I climbed back up in the truck and I got my camera,
12 because all I was thinking is maybe someone is going to drive
13 off and I'm going to have a problem.
14 Q.  So your first action was to get out of the truck.
15 Your second action --
16 A.  -- was to go find out what happened.
17 Q.  -- was to go get a camera?
18     Did you go find out what happened before you got
19 your --
20 A.  Yeah.
21 Q.  -- camera?
22 A.  Yeah, because I didn't know what happened. And then
23 I thought they might drive off, and so I went and took
24 pictures.
25 Q.  Well, take me through your process of finding out

Page 40

1  what happened. Did you go and speak with my client? Did you
2  simply walk up to the car? What happened?
3  A.  No, I ran. I jumped out of the truck, and I ran to
4  the car when I saw the car was sitting there. I didn't know
5  what had happened until I got out of my door and walked
6  around the front of the truck, and I see that my bumper is
7  out a little. You know what I mean? It's like it's been
8  hit.
9      The headlights were still on the truck. It didn't
10 damage the headlights. It just pulled that bumper out. So
11 then I thought that car must have just hit me. So I went up
12 to the car, and he gets out of the car. And I asked him,
13 "Where in the hell did you come from?"
14 Q.  Those are your exact words?
15 A.  Yeah.
16 Q.  What did he say?
17 A.  "Speed limit is 65."
18 Q.  What did he say?
19 A.  That's what he said.
20 Q.  "The speed limit's 65"?
21 A.  Yeah, that's what he said.
22 Q.  Okay. How many lanes are there on 231 northbound?
23 A.  There's two lanes going north.
24 Q.  Two lanes going north and I imagine two lanes going
25 south?

10 (Pages 37 to 40)